**TRADEWAYS INCORPORATED,**
Plaintiff-Appellee-Appellant,

v.

**CHRYSLER CORPORATION,** Defendant-Appellant-Appellee.

No. 169, Docket 28980.

United States Court of Appeals
Second Circuit.

Argued Nov. 13, 1964.

Decided March 1, 1965.

Thorolv T. Waaland, New York City, for plaintiff-appellee-appellant.

Robert Ehrenbard, New York City, (Francis S. Bensel, William S. Gennerich, Joseph E. Downs, and Kelley, Drye, New-hall, Maginnes & Warren, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, SWAN and WATERMAN, Circuit Judges.

SWAN, Circuit Judge:

This is an action for breach of contract. Federal jurisdiction rests on diversity, plaintiff being a New York corporation with its principal place of business in New York and defendant, a corporation of Delaware, with its principal place of business in Michigan.

Plaintiff was engaged in the business of rendering sales promotional services to large corporations. Its complaint alleged that plaintiff entered into an express, bilateral, oral contract with defendant on November 22, 1955, and that defendant broke its contract obligations. Defendant counter-claimed for $12,480.-12, the unpaid balance of a $15,000 advance made by defendant to plaintiff as part of the transaction. The case was tried before Judge Murphy and a jury in January 1964. The jury's verdict awarded plaintiff damages in the amount of $108,000. Judge Murphy directed entry of a judgment in favor of defendant on its counterclaim.

As a preliminary argument Chrysler asks us to dismiss the complaint on the ground that Tradeways failed to prosecute its case with proper dispatch. The original complaint was filed on October 29, 1958. Four amended complaints were submitted between January 3, 1959 and February 18, 1960. The case was dismissed twice for lack of prosecution during 1960 and 1961. Twice it was restored to the calendar with Chrysler's consent. On May 21, 1963, after the restoration of the case to the calendar and on the eve of trial, Tradeways moved for a stay in order to take the deposition of Nielsen, a former Chrysler vice-president, and this motion was granted. Nielsen had not been listed on the pre-trial order although he had been known to Tradeways for a considerable period of time. The deposition was taken on June

17, 1963. On November 1, 1963, plaintiff sought an order allowing it to continue taking Nielsen's deposition, an order which was in violation of the terms of an order issued on October 2, 1963 by Judge Noonan when he previously denied a motion to extend time. Judge Weinfeld denied the motion and suggested that a motion to dismiss for failure to prosecute might be in order. Defendant made that motion, but it was denied by Judge Ryan who noted in his order that the new trial date would be the fourth set for the case.

■ In our opinion, it was an abuse of discretion for Judge Ryan not to grant this motion. The delays appear to be almost entirely the fault of Tradeways. Chrysler's leniency in twice consenting to the restoration of the case to the calendar after the dismissals of 1960 and 1961 should not count against it in determining whether the delay in later proceedings had become intolerable. The delay eventually worked to the prejudice of Chrysler, owing to the unexpected death in an airplane accident in May 1962, three and a half years after the start of this litigation, of Welch, Chrysler's Director of Promotions Programming, who directed Chrysler's performance of the written contract which its answer admitted making, and who could have given testimony valuable to Chrysler.

Shorter delays in prosecuting a case have frequently been held to justify dismissal. See, for examples, Messenger v. United States, 231 F.2d 328, 331 (2d Cir. 1956); Newport v. Revyuk, 303 F. 2d 23, 26 (8th Cir. 1962); Agronofsky v. Pennsylvania Greyhound Lines, 248 F. 2d 829, 830–831 (3d Cir. 1957); Refior v. Lansing Drop Forge Co., 6 Cir., 124 F.2d 440, 444, cert. denied, 316 U.S. 671, 62 S.Ct. 1047, 86 L.Ed. 1746 (1942).

My brother WATERMAN disagrees with the decision to dismiss the case on the ground of prejudicial delay in its prosecution. As his dissent would have to discuss the contract issues and both parties have argued them in their briefs, it seems desirable to discuss such issues in this opinion.

Plaintiff's action was commenced October 29, 1958. It alleged the making of a bilateral oral contract with defendant on November 22, 1955. Defendant's answer denied that it entered into an oral contract but admitted that on or about March 23, 1956, plaintiff agreed to conduct a twelve-month sales training and development program to be paid for by DeSoto dealers at the rate of $15 per month, and to repay to defendant, at the rate of $1500 per month, the sum of $15,000 advanced to plaintiff by defendant. The agreement was defendant's Purchase Order (defendant's Exhibit A).

The alleged oral agreement of November 22 was said to contain a promise by Chrysler that it would use its "best efforts" to obtain dealer subscriptions for the Tradeways program. The written agreement of March 23 contained no such requirement. Plaintiff's entire case is predicated on the theory that the breach of the "best efforts" requirement in the oral contract caused Tradeways to incur losses in conducting its program, for which Chrysler should be held liable. Thus the gravamen of plaintiff's case is the existence and contents of the alleged oral agreement of November 22.

In 1 Corbin on Contracts, § 22 (1963), it is stated that "The history of any contractual transaction is merely the narrative of a series of events," and that these events should be considered "in their chronological order, determining their legal operation one by one as they have occurred." In their briefs both plaintiff and defendant cite § 22 and each claims it has applied these principles to the series of events in the case at bar; but they arrive at completely contradictory results. In our discussion we shall also attempt to apply the principles stated by Professor Corbin.

In the spring of 1953 Robert E. Taylor was made vice-president of Tradeways in charge of new business and he continued in that capacity until April 1, 1956. On February 23, 1955, Mr. Taylor wrote the defendant "seeking to interest it in a sales training method known as the 'Case Cast' method, which Tradeways had pre-

viously developed and which was currently being used by American Motors Corporation." He testified to going to the defendant's offices in Detroit, Michigan, on March 29, 1955 where he demonstrated the Case Cast technique and presented a price sheet telling "how much we were paid for building these cases for individual companies." His next contact with defendant was in April 1955 when he went to Detroit to call on American Motors and "stopped in at DeSoto." He saw Mr. Mix, an employee of the defendant, who asked Taylor to supply him with a case recording made for American Motors in which American Motors' name was deleted and the word DeSoto substituted so that the defendant's executives could listen to this recording and get an idea how it might apply to their own selling activities. Taylor agreed to do this. On October 11, 1955 Mr. Taylor went to Detroit and talked with Mr. Blount and Mr. Mahler, employees of the defendant, who wanted to know about the technique of the Case Cast training and about the other recommendations Taylor had made in the earlier meetings with other DeSoto executives so that they [Blount and Mahler] could be brought up to date. Taylor prepared such an outline and sent it in a letter to Mr. Blount dated November 4, 1955. Four or five days later Mr. Taylor telephoned Mr. Blount and was asked by him to come to Detroit because a completely new development had arisen which Blount wanted to discuss with Taylor. Taylor went to Detroit on November 14, 1955. He was told that it had been decided not to go ahead with the Case Cast program because the executives of defendant had decided on a much larger program and were inviting Tradeways and two other organizations to make full-scale presentations on November 22 as how to carry out these objectives for the DeSoto Division.

■ On November 22, 1955, Mr. Taylor presented the program proposed by Tradeways to a group of defendant's major executives. The program had been recorded on a record which was played to the assembled group and Mr. Nielsen, an officer of the defendant remarked "This is the finest program we have heard yet." The members of the group began to discuss plans for the program in more concrete terms. For several reasons this remark and the discussions that followed cannot operate as an acceptance of plaintiff's offer. One reason is that Mr. Taylor had also discussed the cost to the defendant and had stated two alternative price terms. The first alternative was that one part of the program could be purchased for $130,000 and the other part for between $35,000 and $40,000. The second was that each participating dealer would purchase the program for $180, to be paid at the rate of $15 per month. It is well settled that no contract can be formed if agreement has not been reached on an essential element, and price is certainly such an element. 1 Corbin on Contracts § 97 n. 31 (1963); Boatright v. Steinite Radio Corp., 46 F.2d 385 (10 Cir. 1931); Ansorge v. Kane, 244 N.Y. 395, 398–399, 155 N.E. 683 (1927). Moreover, Chrysler told Mr. Taylor they wanted the proposal in writing. No agreement could bind Chrysler until the parties settled on a written document. 1 Corbin on Contracts § 30 (1963); Ambler v. Whipple, 87 U.S. (20 Wall.) 546, 555–556, 22 L.Ed. 403 (1874); Banking & Trading Corp. v. Floete, 257 F.2d 765, 769 (2 Cir. 1958); Willmott v. Giarraputo, 5 N.Y.2d 250, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959); Michigan Broadcasting Co. v. Shawd, 352 Mich. 453, 90 N.W.2d 451 (1958).

■ Four or five days after the presentation on November 22, defendant's employee, Mr. Blount, telephoned Mr. Taylor that Tradeways was "selected" but Taylor did not know whether payment alternative No. 1 or No. 2 was accepted, and in any event it is apparent that the telephone conversation was not intended to supersede the requirement that Tradeways' offer be in writing, and therefore it cannot be considered to be the agreement from which Chrysler's obligations are measured.

Following the meeting of November 22 Taylor returned to New York and pre-

pared, after conferring with plaintiff's president, Mr. Lough, the letter of November 29. Taylor presented this at defendant's offices on November 30. The last paragraph of the letter stated: "If this letter is a correct statement of our agreement your acceptance thereof will be signified by your signature below." The letter was never signed by defendant. Mr. Mahler told Mr. Taylor he could not sign the letter and suggested numerous changes. Mr. Taylor returned to New York where he and Mr. Lough prepared a second letter incorporating the changes suggested by Mr. Mahler. This letter, dated December 1, 1955, was mailed to defendant. The final statement of the letter reads: "If this letter is a correct statement of our understanding, that understanding will be evidenced by a signature below." This letter also was never signed by defendant.

■ Taylor's next meeting with representatives of defendant occurred on December 15. He went to defendant's offices to procure a signature to the letter dated December 1. He was told by Mahler that he could not sign the letter without reviewing it with his superiors and with the legal department of defendant. A communicated rejection of an offer causes it to become a nullity, 1 Corbin on Contracts § 94 (1963). But this is true only if the person who rejects the offer had authority to accept it; if he lacked such authority his rejection has no legal significance. Defendant's undisputed evidence proved that Mahler has no authority to accept Tradeways' offer. Nor is there any evidence that Mahler had apparent authority to accept or that plaintiff relied upon his having apparent authority.

On December 23, plaintiff prepared and mailed to defendant's purchasing department its third offer consisting of a letter signed by Taylor which enclosed two copies of an outline of a training program "we are preparing for the DeSoto Division," Exhibit 11. The court's comments are revealing. It was the court's view that "this gentleman [Mr. Taylor] who just finished testifying said in substance that they hadn't yet arrived at a contract by the end of the year [1955]." The December 23rd offer asked for the issuance of a purchase order. Such order was not issued until March 23, 1956.

■ From the foregoing narrative of events in their chronological order we are convinced that the parties made no oral contract and that their first written contract was dated March 23, 1956 and was actually received by plaintiff the following May 7.

In his charge to the jury, Judge Murphy stated the contentions of the parties and summarized the evidence with complete fairness. He told the jury it should determine (1) whether an oral contract was made and (2) if an oral contract was proved, whether defendant broke it. If either point 1 or 2 was found against plaintiff, the jury's verdict must be for defendant, but if both points were found in favor of plaintiff, then the jury should award damages. The Foreman of the jury reported its verdict as follows:

"On point 1, we find there was an oral contract.

"2. There was a breach of the oral contract by the defendant.

"3. We award the plaintiff damage to the extent of $108,000."

■ It is clear beyond dispute that everything Taylor did following the November 22nd meeting was done in an effort to comply with the requirement of a signed contract. Without such a signature there could be no binding contract, cf. 1 Corbin on Contracts § 29 (1963). Permitting the jury to determine whether the parties had entered into an oral contract was an error so serious as to compel reversal.

At the conclusion of plaintiff's evidence and again at the conclusion of all the evidence Chrysler moved for a directed verdict. Denial of this motion is asserted to be an error requiring reversal of the judgment for plaintiff. We hold that it is, and we direct verdict for defendant.[1]

1. Defendant requested the court to charge that if the jury conclude that it was the intention of the parties to contract with one another in writing then you cannot

Higgs v. De Maziroff, 263 N.Y. 473, 476–478, 189 N.E. 555, 92 A.L.R. 807 (1934).

Alternatively Chrysler asserts that it was error to submit the issue of the existence of the oral contract to the jury because proof of the alleged contract was barred by the statute of frauds. We agree. Judge Murphy ruled on this subject in his opinion dated February 28, 1964. Apparently he thought the New York statute rather than the Michigan statute applicable, but as they are substantially identical it is immaterial.[2] He correctly found that since plaintiff's services were to last for at least one year, and were to commence at a time after the making of the agreement between the parties, the oral agreement was one which was not to be performed within one year. McLaughlin v. Ford Motor Co., 269 F.2d 120, 124–125 (6 Cir. 1959). The court's error is in construing the contract "as one for the sale of special order goods" and that is to be "governed by the provisions of § 85 of the Personal Property Law rather than § 31." [3] Plaintiff's business was furnishing professional services. The goods supplied were merely incidental to those services. It could not be reasonably contended that

find they entered into an oral contract. The court declined to give this charge. What the court said is quite inadequate. The charge was erroneous but as errors in the charge would merely result in a new trial such errors are not important in view of our earlier rulings.

2. New York Personal Property Law, McKinney's Consol.Laws, c. 41, § 31 provides in relevant part:

"Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, of such agreement, promise or undertaking;

"1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime; * * *"

Mich.Comp.Laws, § 566.132 (1948), Mich.Stat.Ann. § 26.922, provides in relevant part:

"In the following cases specified in this section, every agreement, contract and promise shall be void, unless such agreement, contract or promise, or some note or memorandum thereof be in writing and signed by the party to be charged therewith, or by some person by him thereunto lawfully authorized, that is to say:

"1. Every agreement that, by its terms, is not to be performed in 1 year from the making thereof; * * *"

3. New York Personal Property Law, § 85 provides in relevant part:

"1. A contract to sell or a sale of any goods of the value of five hundred dollars or upward, except where the goods are to be manufactured especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, shall not be enforceable by action unless:

"(a) There is some note or memorandum in writing signed by the party to be charged or his agent in that behalf, sufficient to indicate that a contract to sell or a sale has been made between the parties and showing the quantity of goods sold or contracted to be sold, or

"(b) The buyer has accepted part of the goods and actually received the same, or

"(c) The buyer has given something in part payment. * * *"

Michigan Comp.Laws, § 440.4 (1948), Mich.Stat.Ann. § 19.244, provides in relevant part:

"(1) A contract to sell or a sale of any goods or choses in action of the value of 100 dollars or upwards shall not be enforceable by action, unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged, or his agent in that behalf.

"(2) The provisions of this section apply to every such contract or sale, notwithstanding that the goods may be intended to be delivered at some future time, or may not at the time of such contract or sale be actually made, procured or provided, or fit or ready for delivery, or some act may be requisite for the making or completing thereof, or rendering the same fit for delivery; but if the goods are to be manufactured by the seller especially for the buyer, and are not suitable for sale to others in the ordinary course of the seller's business, the provisions of this section shall not apply. * * *"

by writing a brief the lawyer's contract is converted into a contract for the sale of goods. Cf. City Title Ins. Co. v. Traub, 116 N.Y.S.2d 35 (App.T.1952). However, it has been held that the requirement of a writing in § 31(1) is applicable whether or not the contract is classified as one for the sale of goods. Lieberman v. Templar Motor Co., 236 N. Y. 139, 146, 140 N.E. 222, 29 A.L.R. 1089 (1923) (Cardozo, J.). The history of the two categories bears out this interpretation, as the "special order goods" exception of § 85 grew out of court holdings that contracts for these goods were not to be classified as contracts for goods at all, but were in fact contracts for "work and labor." See Indiana Limestone Co. of New York v. Harry Bernstein Cut Stone Co., 263 App.Div. 312, 313–314, 32 N.Y.S.2d 956 (1942); Gura v. Herman, 227 App.Div. 452, 455–456, 238 N.Y.S. 230 (1929), aff'd mem., 253 N.Y. 618, 171 N.E. 808 (1930); Bauscher Bros. v. Gies' Estate, 160 Mich. 502, 125 N.W. 420 (1910). Further, this interpretation is in accordance with the well recognized doctrine that the existence of other exceptions to the statute of frauds does not take a contract out of the statute if performance is to continue beyond one year—the one-year rule of § 31(1) is still applicable. 2 Corbin on Contracts § 469 (1950); 3 Williston on Contracts § 501, at 613–615 (3d ed. 1960). Therefore, the statute of frauds would bar the introduction of any evidence relating to the alleged oral agreement of November 22, as there exists no memorandum signed by Chrysler embodying the terms of that agreement.

With regard to the counterclaim, judgment was ordered entered in favor of Chrysler for $12,480.12, which, by Tradeways' admission, was the unpaid balance of a $15,000 advance made by Chrysler to Tradeways under the terms of the written contract. We find no error with respect to this judgment and accordingly affirm.

Judgment on Tradeways' claim is reversed with instructions to dismiss the complaint. Judgment on Chrysler's counterclaim is affirmed.

WATERMAN, Circuit Judge (concurring):

The court's opinion points out clearly that the result reached is predicated upon analysis of the merits of the parties' controversies. Therefore, I wholeheartedly concur therein. Nevertheless, as mention is made that my brothers might have resolved the case by holding that the Chief Judge of the Southern District abused his discretion in denying the defendant's motion to dismiss the case for plaintiff's failure aggressively to prosecute its claim, and courteous mention is also made that I would disagree with such a holding, I respectfully add my bit of dictum to theirs. It is significant that the four cases they cite are affirmances of dismissals by the district judges— none is a reversal of a failure to dismiss. These cases support my approach, which is simply that our appellate tribunal should not interfere with the control by the district courts of their civil dockets unless the circumstances are astonishingly egregious. With that standard in mind I would say that here the action taken by the Chief Judge of the busy Southern District was well within his discretion.